## <u>AFFIDAVIT OF SPECIAL AGENT ANTHONY J. VENTETUOLO</u>

I, Anthony J. Ventetuolo, having been duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since May 2015, and am presently assigned to the Worcester Satellite Office of the Springfield Field Office.   I am currently assigned to the Springfield Area Firearms Enforcement Task Force.   My responsibilities are to investigate and prevent offenses involving the unlawful use, manufacture, and possession of firearms and explosives.   I attended and successfully completed the Department of Homeland Security Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Brunswick, Georgia.   In August 2018, I attended and completed ATF Firearms Interstate Nexus Training at the ATF National Center for Explosives Training and Research in Huntsville, Alabama.

2.      I was previously employed by the United States Army Special Operations Command as a Training Instructor in direct support of a Special Operations military unit and completed three overseas deployments in support of the Global War on Terror.   I served as a Police Officer with the City of Virginia Beach, Virginia Police Department from 2002 until 2012.   I earned Bachelor of Science degrees in political science and public administration from James Madison University and earned a Master's degree in criminal justice from Troy University.

3.      While employed as a Police Officer and Special Agent, I have: investigated violations of local, state and federal criminal statutes; made arrests, prepared search and arrest warrant affidavits; interviewed defendants, witnesses and informants; and seized currency, firearms, narcotics and other evidence related to criminal investigations.   I have experience and training in firearms and narcotics trafficking cases, gang investigations and the utilization of

informants and cooperating witnesses to investigate firearms and narcotics trafficking and other organized criminal activity.

4.       I have received training in analysis of call detail and other records from electronic communication facilities commonly used by individuals engaged in criminal activity to communicate about their illegal enterprises.  I have used information obtained from communication facilities, including service provider records and GPS location information, to investigate criminal conspiracies involving firearms and narcotics offenses.  I am familiar with the "street" language used by firearm and/or drug traffickers via electronic communication facilities, as well as the methods they use to disguise conversation and operations.

## PURPOSE OF AFFIDAVIT

5.       This affidavit is submitted in support of an application for a criminal complaint and arrest warrant charging Caitlin MARCEY a/k/a "Lady Lord" (born 1992) with distribution of a controlled substance, in violation of 21 U.S.C. § 841(a) (the "Subject Offense").  Based on the facts presented in this affidavit, there is probable cause to believe that MARCEY has committed the Subject Offense.

6.       The affidavit is also submitted in support an application to search the cell phone assigned telephone number 774-666-0633 that is being used by MARCEY (hereinafter the "MARCEY PHONE"). Records obtained from Verizon Wireless indicate that Theresa F. of Maynard, Massachusetts is the subscriber of record for this phone number.[1]  MARCEY's Massachusetts criminal history lists "Theresa" as MARCEY's mother.

7.       As detailed, there is probable cause to believe that (a) the MARCEY Phone has been used, is being used, and will continue to be used to facilitate the commission of the Subject

---

[1] The full name and address were included in the Verizon Wireless records.

Offense, and (b) the MARCEY Phone contains evidence of crimes; contraband, fruits of crime, or other items illegally possessed; and constitutes property designed for use, intended for use, or used in committing the Subject Offenses.  A more specific list of items to be seized may be found in Attachment A.

8.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  This affidavit includes only those facts I believe are necessary to establish probable cause for the issuance of the requested complaint and search warrant and does not include all of the facts uncovered during the investigation.

## RELEVANT STATUTES

9.      Title 21 United States Code, Section 841(a) provides, in relevant part, "it shall be unlawful for any person knowingly or intentionally-- (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

10.     Title 21, United States Code, Section 812 identifies marijuana (a/k/a tetrahydrocanninol ("THC"), as a Schedule I controlled substance.

11.     Synthetic marijuana is an anologue of THC.  Title 21, United States Code , Section 813 provides that "a controlled substance analogue shall, to the extent intended for human consumption, be treated, for purposes of Federal law as a controlled substance in Schedule I.

## PROBABLE CAUSE

A.     Background of the Investigation

12.     For several years, Massachusetts jails have been combatting the issue of synthetic marijuana –often referred to as "K2" – being illegally introduced into the jails.  The most

common means by which this is occurring is by persons outside the jail soaking or spraying synthetic marijuana onto documents, and then transporting those documents, either in person or by the mail, into the jail.  Once inside the jail, the documents that have been soaked or sprayed with synthetic marijuana can be smoked.

13.     According to investigators at the Worcester County Sheriff's Department, the agency responsible for operating the Worcester County House of Corrections ("WCHC"), it is common to attempt to introduce documents soaked in synthetic marijuana in mailings disguised as legal mail, as this mail is generally not subjected to rigorous screening due to attorney-client privilege.

B.     MARCEY's November 2018 Distribution of Synthetic Marijuana into the Souza Baranowksi Correctional Center.

14.     On or about October 22, 2018, officers assigned to the Office of Investigative Services ("OIS") at Souza Baranowski Correctional Center ("SBCC") reviewed an outgoing particle of mail that was being sent by an inmate at SBCC ("Inmate #1").  The manila envelope was addressed to:

> Caitlyn Marcy
> 169A Olde Derby Road
> Norwood, Ma, 02061

Inmate #1's name and inmate identification number was listed as the return address on the envelope.

15.     The envelope contained a handwritten one-page letter from Inmate #1 to "Caitlyn." In that letter, Inmate #1 indicated that he was "reaching out to get this paperwork to you."  In the letter, Inmate #1 identified 2 other inmates by last name, hereinafter "Inmate #2" and "Inmate #3." Inmate #1 instructed MARCEY to start with Inmate #3 because "he's a bro," but indicated that she needed to move quickly because Inmate #3 "leaves Nov 7."  Inmate #1 further instructed

MARCEY to "hold on to [Inmate #2] cuz we gonna go with him on the next round ok?"  Finally, Inmate #1 wrote "well hun I hope this is the stuff that you needed and you can help us out cuz we been hurtin up here."

16.     Also included within the envelope were two envelopes that appeared to have originated from two separate lawyers' offices, one was addressed to Inmate #2 at SBCC and the other was addressed to Inmate #3 at SBCC.  Finally, the envelope contained court records that appeared to relate to the criminal matters against Inmate #2 and Inmate #3.

17.     As a result of the review of the package sent out by Inmate #1, OIC investigators reviewed several recorded phone calls placed from inmates at SBCC to the MARCEY Phone. On October 21, 2018, at approximately 7:11 pm, Inmate #4 called the MARCEY Phone.  During the ensuing conversation, Inmate #4 indicated that an SBCC inmate intended to send MARCEY "return names." This was consistent with Inmate #1 sending MARCEY the "return names," i.e. the names of Inmate #2 and Inmate #3, the following day, October 22, 2018.

18.     On November 16, 2018, at approximately 3:34 pm, Inmate #4 made a recorded phone call to the MARCEY Phone.  During that call, Inmate #4 asked MARCEY if she "sent pictures."  MARCEY responded yes, and stated that it was "second one."  Based on the October 22, 2018 letter sent by Inmate #1, investigators believed that she was referring to an item sent to Inmate #2, as Inmate #1 had instructed her in October to delay sending material to that inmate.

19.     On November 18, 2018, at approximately 9:24 pm, Inmate #4 placed another phone call to the MARCEY Phone.  During that call, Inmate #4 asked MARCEY if she "took care of that for him."   MARCEY responded yes and indicated that she could "track it" if he wished.  Inmate #4 affirmed he did want her to track the item.

20.     On November 20, 2018, at approximately 1:40 pm, Inmate #4 placed another recorded phone call to the MARCEY Phone.  During that call, MARCEY informed Inmate #4 that she "screwed it up" but that "it" would be there the following day.

21.     On November 23, 2018, at approximately 3:55 pm, Inmate #4 placed another recorded phone call to the MARCEY Phone.  During that call, MARCEY asked Inmate #4 if he received the item that she sent.  Inmate stated that he had not.  MARCEY assured Inmate #4 that the package was at SBCC because she tracked it.

22.     On November 24, 2018, SBCC investigators processed an envelope that was marked as legal mail for Inmate #2.  Inmate #2 signed the SBCC "Legal Mail Book," thereby accepting the delivery of legal mail from his attorney.  The envelope appeared to be the same as one of the two envelopes that Inmate #1 had mailed to MARCEY on October 22, 2018.  Pursuant to SBCC policies and procedures regarding the inspection of suspicious mail entering the facility, SBCC investigators opened the envelope and removed the 11 pages therein.  Ten of the 11 pages appeared to be the same as the court records sent by Inmate #1 to MARCEY on October 22, 2018.  The only document that appeared to be changed was the purported cover letter from the attorney to Inmate #2.  That cover letter appeared to be retyped in a different font and format, with a different signature for the alleged attorney.

23.     The 11 pages were analyzed by the University of Massachusetts Medical School Drugs of Abuse Laboratory and tested positive for the presence of a synthetic cannabinoid.

24.     The mailing included a certified tracking number.  That tracking number was processed through the United States Postal Service ("USPS") Tracking Database which revealed that the envelope was mailed from a postal office in Framingham, Massachusetts on November

20, 2018, the same date that MARCEY told Inmate #4 that she had "screwed up" but that the mailing would be there "tomorrow."

C.  MARCEY's December 2018 Distribution of Synthetic Marijuana into the Worcester County House of Corrections

25.     On December 21, 2018, the Investigations Department of the Worcester County Sheriff's Department seized a letter addressed to Inmate #5, an inmate at WCHC.  Inmate #5 had recently been transferred from the Hampden County House of Correction to WCHC because of his involvement in a scheme to introduce synthetic marijuana into that facility.  As a result, and pursuant to the Sheriff's Department's policies and procedures, investigators at WCHC obtained authorization to conduct a "mail pull," in order to open and monitor Inmate #5's incoming and outgoing mail.

26.     The letter seized on December 21, 2018 appeared to have been sent from Inmate #5's attorney.  The mailing contained a letter written on standard sized 8.5" x 11" paper.  The paper was analyzed by the University of Massachusetts Drug Laboratory which identified the presence of a synthetic cannabinoid.

27.     The letter seized on December 21, 2018 included a certified tracking number.  That tracking number was processed through the United States Postal Service ("USPS") Tracking Database which revealed that the envelope was mailed on December 18, 2018, at approximately 1:48 pm, from a United States Post Office in Framingham, Massachusetts.

28.     WCHC investigators obtained security video from the Post Office from which the letter was sent.  I am familiar with MARCEY's appearance.  I have reviewed that video and MARCEY is depicted at the USPS counter mailing an item on December 18, 2018 at approximately 1:48 pm.

29.     On December 27, 2018, at approximately 11:30 am, the MARCEY Phone received

7

a call from the WCHC phone account of Inmate #6, who is the father of Inmate #5.[2]  MARCEY

subsequently spoke to Inmate #5 and another known male, Inmate #7.  Inmate #5 appeared upset

with MARCEY and stated "the 18th was Tuesday, just to let you know."  MARCEY responded,

"that's when I did it."  Inmate #5 replied "that doesn't make any sense" and later told MARCEY,

"you're pissing me the f--- off, just letting you know."  Inmate #5 then apparently handed the

phone to Inmate #7.

30.     During the subsequent conversation between MARCEY and Inmate #7, MARCEY

stated "He [Inmate #5] is going to say I'm lying when Female #1 saw the shit."[3]  MARCEY

continued to explain that "Female #1 saw the proof," before Inmate #7 replied, "he [Inmate #5]

say to stop talking."

31.     Based on the investigation to date, I believe the December 27, 2018 conversation

between MARCEY, Inmate #5 and Inmate #7 was related to their conspiracy to distribute synthetic

marijuana into WCHC.  Inmate #5's reminder that the "18th was Tuesday," and MARCEY

responded "that's when I did it, was likely a reference to the fact Inmate #5 had not received the

mail that MARCEY mailed from the U.S. Post Office in Framingham on December 18, 2018, as

at that time Inmate #5 was not aware that the mailing was intercepted by WCHC investigators.

---

[2] Inmates frequently use phone accounts of other inmates in order to frustrate law enforcement attempts to obtain information by listening to calls made on accounts listed under their own names.

[3] MARCEY's referred to Female #1 by first name.  That was likely a reference Roger LEWIS' girlfriend at the time of the call.

## SEARCH OF CELLULAR TELEPHONE

32.     As described in <u>Attachment A</u>, I also seek authorization to search and seize the

MARCEY Phone.

33.     Based on my training and experience, I know that individuals involved in illegal

narcotics distribution use cellular telephones to communicate about their drug trafficking

activities with customers, suppliers, and other coconspirators.  As described above, MARCEY

used the MARCEY Phone, the telephone assigned number 774-666-0633 to communicate with

inmates at SBCC and WCHC related to illegal narcotics transactions.  Because cellular

telephones are often a principal means of communication, individuals typically keep the phones

in close proximity or at their residences.

34.     Based upon my knowledge, training, and experience, I know that a cellular

telephone is a handheld wireless device used primarily for voice communication through radio

signals.  These telephones send signals through networks of transmitter/receivers called "cells,"

enabling communication with other wireless telephones or traditional "land line" telephones.  A

wireless telephone usually contains a "call log," which records the telephone number, date, and

time of calls made to and from the phone.  In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities.  These capabilities include, but are

not limited to: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from

the Internet.  Cellular telephones may also include global positioning system ("GPS") technology

for determining the location of the device.  Based on my training and experience, I know that

many cellular telephones have the capabilities described above.

35.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities on their cellular telephones.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment A on their cellular telephones.

36.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular

phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

37.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts

from operating system or application operation; file system data structures, and virtual

memory "swap" or paging files.  It is technically possible to delete this information, but

users typically do not erase or delete this evidence because special software is typically

required for that task.

d.       Similarly, files that have been viewed over the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."  The browser

on a cellular telephone often maintains a fixed amount of hard drive space devoted to

these files, and the files are overwritten only as they are replaced with more recently

viewed Internet pages or if a user takes steps to delete them.

38.       Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am

applying for would permit the examination of the device, i.e. the MARCEY Phone, consistent

with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

## APPLE TOUCH ID

39.       It is possible that the MARCEY Phone will be an Apple iPhone.  I know from my

training and experience, as well as from information found in publicly available materials

including those published by Apple, that some models of Apple devices such as iPhones and

iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a

numeric or alphanumeric passcode or password.  This feature is called Touch ID.

40.       If a user enables Touch ID on a given Apple device, he or she can register up to 5

fingerprints that can be used to unlock that device.  The user can then use any of the registered

fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID

sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

41.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

42.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  Should agents find that the MARCEY Phone is an Apple iPhone, I request that the Court authorize law enforcement to press Caitlin MARCEY's fingers to the iPhone for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

*       *       *       *       *

43.    WHEREFORE, based on the foregoing, I submit that there is probable cause to

believe that Caitlin MARCEY has committed the Subject Offense, to wit: distribution of a

controlled substance, in violation of 21 U.S.C. § 841.

44.    Further, I submit there is probable cause that the MARCEY Phone has been used,

is being used, and will continue to be used to facilitate the commission of the Subject Offenses,

and (b) the MARCEY Phone contains evidence of crimes; contraband, fruits of crime, or other

items illegally possessed; and constitutes property designed for use, intended for use, or used in

committing the Subject Offenses, as specifically detailed in Attachment A, hereto.

WHEREFORE, your affiant respectfully requests that the Court issue a criminal

complaint charging Caitlin MARCEY with the Subject Offense, and a warrant authorizing the

search of the MARCEY Phone.


ANTHONY J. VENTETUOLO
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives


Sworn and subscribed to before me this __4th__ day of June 2019, at Worcester,

Massachusetts.


DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts

14